# William D. Whitlock

*v.*

# Sarah McClusky *et al.*

1. FORGERY—*sufficiency of evidence to show.* Where the name of an intestate upon a note of $1000 which had been allowed against his estate, was shown not to be in his handwriting, and it was not shown that any one had general authority to sign notes for him, or special authority to execute this particular one, and the intestate's name was signed just after that of one M. and if written by M was not in his usual, but in a simulated handwriting, and that M, when charged with the forgery, absconded from the State, and the payee offered no explanation whatever, and it appeared the note was not presented until nearly two years after the testator's death, and about the same length of time after maturity, it was held that these facts and other circum-

stances were sufficient to show that the pretended·signature of the intestate
was a forgery.

2. ADMINISTRATION—*when letters fraudulently obtained.* The procuring of
letters of administration by the attorney of claimants in pursuance of a pre-
arranged plan to procure the allowance of their claims, without notice to the
heirs, and without defence, is a fraud not only upon the heirs but also upon
the court.

3. SAME—*payment of fraudulent claim prevented in equity.* Where the hold-
ers of two forged notes procured the appointment of their attorney as admin-
istrator after consultation with him, and by collusion, and the administrator,
without notifying the heirs, or filing any inventory or making any inquiry
as to the personalty, gave notice for the presentation of claims and consented
to the allowance of such forged notes, without requiring any proof, or even a
sufficient affidavit from the claimants, and afterwards procured an order for
the sale of real estate to pay such claims, the heirs being lulled into repose
by the forger acting with the claimants, upon conference with the adminis-
trator, it was *held,* that a court of equity, in view of the fraud and collusion
and imposition upon the heirs, would prevent the payment of the unpaid pur-
chase money of the land to such claimants, and order it paid to the heirs
whose property had been wrongfully sold.

4. ESTOPPEL—*when not allowed in equity.* Persons pretending to hold claims
against an estate will not be allowed to take advantage of the estoppel of an
order for the sale of the lands of heirs, as against such heirs, where such
estoppel grows out of a mere neglect to defend, and that neglect was induced
by the conduct of such claimants and their attorney acting as administrator,
and no merit is shown in their claims.

APPEAL from the Appellate Court of the Third District; the
Hon. CHAUNCEY L. HIGBEE, presiding Justice, and the Hon.
OLIVER L. DAVIS and Hon. LYMAN LACEY, Justices.

Mr. JOHN B. JONES, and Messrs. PALMER, PALMER &
ROSS, for the appellant.

Messrs. HAY, GREENE & LITTLER, for the appellees.

Mr. JUSTICE BAKER delivered the opinion of the Court:

A bill was exhibited in the circuit court of Christian
county by the appellees, heirs at law of one William Johnson,
deceased, against James C. McQuigg, the administrator of
said Johnson, and William D. Whitlock and J. B. Fagan, in

whose favor claims had been allowed in the county court, and William T. Vandeveer, the purchaser of certain lands that had belonged to Johnson in his lifetime, to compel the administrator to account for the proceeds of the sale of the lands, to the complainants as heirs, instead of applying them to the payment of the claims of Whitlock and Fagan. The theory of the bill was, that the notes which had been allowed against the estate were forgeries; that they were improperly allowed by the administrator, who was the attorney of the holders of the notes; and that the holders of the notes colluded with the administrator and one McClusky in defrauding the heirs.

The venue of the cause was changed to Sangamon county, and in the circuit court of that county, upon a hearing, a decree was entered ordering the unpaid purchase money to be paid to the heirs whose lands had been sold.

The defendant Whitlock perfected an appeal to the Appellate Court of the Third District. In that court the decree of the circuit court was affirmed; and thereupon said Whitlock appealed to this court.

The name of William Johnson to the note of Whitlock was not in his handwriting, and did not resemble his handwriting; it is not shown any one had general authority to sign such instruments for him, or special authority to execute this particular note; it is not shown McClusky ever at any time had authority to sign Johnson's name to any paper; the signature here was in immediate connection with the name of Mc-Clusky, following his on a joint note, and if written by McClusky was not in his usual but in a simulated handwriting; and McClusky, when charged with the forgery, abandoned his home and family and absconded from the State. We think these facts, combined as they are with many other circumstances tending to the same conclusion, sufficiently show the signature of Johnson to said note was a forgery.

William Johnson died in January, 1873. Nothing was heard of this forged note until the fall of 1874, nearly two

years after the death of Johnson, and nearly two years after
the note fell due, when it appeared in the hands of Whit-
lock, the payee named therein.   There is no evidence in the
record to show the note was genuine, or the circumstances
under which it was given; nothing to show either Johnson or
McClusky was ever indebted to Whitlock, or any considera-
tion paid for the note.   Appellant, although he had full op-
portunity to do so, has given no explanation of his possession
of this forged instrument.   The transaction out of which it
originated must have been directly with him, the payee thereof.
It may be possible no one was present when the note was
taken, yet it is hardly probable there was a business dealing
or transaction with either McClusky or Johnson, in which a
note for so large a sum as $1000 was executed, and wherein
a consideration passed from him to either or both of them,
and still there be no legal evidence to indicate such transac-
tion.   If it grew, incidentally, out of a transaction with some
third party, then the testimony of that third party could
readily be produced.   The note is attacked as a forgery, and
yet there is no effort made to show a meritorious possession
on the part of the holder.

In the fall of 1874, Fagan, the holder of the other forged
note, and who also represented Whitlock, consulted McQuigg
as an attorney, in regard to the collection of the two notes.
Shortly afterwards Whitlock personally consulted with Mc-
Quigg on the same subject.   As the result of these consulta-
tions, and in furtherance of the advice given as an attorney
and of the plan agreed upon, McQuigg, who does not know
whether he had these claims in his hands or not at the time
he applied for letters, took out letters of administration upon
the estate of Johnson.   He thereupon, forthwith, and with-
out any notification to the children and heirs of Johnson
either that he had the notes, or that any such were in exist-
ence, or that he had been appointed administrator of the
estate of their father, and without making or filing any in-
ventory or appraisement bill, or paying any attention to or

making any inquiry after personal estate, fixed an adjustment day and advertised for the presentation of claims against the deceased. Fagan was there on that day, and McQuigg is not sure whether Whitlock was or not. McQuigg had been consulted as an attorney as to what steps to take in order to enforce the collection of these notes, and all subsequently done in that regard was done as the result of the advice given and plan determined on. If Fagan or Whitlock, the supposed creditors, had either of them procured letters of administration, then the statute would have required the appointment by the county court of some discreet person to appear and defend the estate against the demand of the administrator; but here the statute was evaded by securing the appointment of the attorney of the claimants. It was a fraud not only upon the heirs, but upon the court.

Both claims were allowed. It does not appear any evidence of the signatures or of the genuineness of the notes was required by the administrator; but it does appear the affidavits of the claimants, instead of conforming to the statutory requirement and stating the claims were "just and unpaid," stated merely the respective amounts that were " due and unpaid on the notes." It is suggested the notes were allowed by the county court, and not by the administrator. This is in one sense true; but the court was probably misled by the imposition upon it of an administrator who was secretly interested against the estate; and, at all events, the facts and circumstances stated throw light on the conduct and intentions of the administrator and claimants.

After this, for the first time, the administrator went out in the country to the farm of appellees, to make an inventory. They, up to this time, were in total ignorance of any administration proceedings. These heirs, the appellees herein, consisted of a feeble-minded man, who appears here by his conservator, and two women; one of them the wife of McClusky. McQuigg testifies he never had any collusion with McClusky, and did not confer with him about the matter in any way; and yet it

appears from his own testimony that McClusky had told his wife that he, McQuigg, was coming out. This would seem to indicate at least some degree of conference between them in regard to the matter.

McQuigg and Mrs. McClusky do not agree as to what took place at this interview. There is no question he told appellees he had been appointed administrator and had in his possession notes to which the name of William Johnson was signed. He says he then and there informed the heirs the notes had been allowed, and the amount of them would have to be made out of the land. She testifies she did not know of the allowance of the claims until after the land was sold. Neither of them states that the amount called for by either of the notes was mentioned. He did not show them the notes; and he does not pretend to say he informed them he was the attorney of the claimants. The heirs, then, had good right to rely on the good faith of the administrator and trustee. The holders of these claims, colluding with their own attorney, had, without the knowledge or consent of the heirs, thrust that attorney into a position of fiduciary relationship to them. McQuigg having voluntarily assumed that position of trust, should have ascertained the signatures to the notes were not in the handwriting of Johnson and were forgeries. The heirs had a right to presume he neither had permitted nor would permit the allowance of fraudulent and forged claims, by neglect of duty on his part, and that he was not inimical to their rights, so far as the probating of debts against the deceased was involved.

The only serious question in the case is this. The administrator afterwards filed a petition for the sale of lands to pay the debts of the estate, and in said proceeding a summons was duly issued and served upon the heirs. They had the undoubted right to then appear and contest the justice of the claims of Whitlock and Fagan. The existence of the debts allowed was necessarily put in issue by the proceedings for a sale. Appellees admit the proceedings for the sale of the lands are so far conclusive upon them that the decree of sale is not open to attack,

and that the title of the purchaser in good faith of the lands at the administrator's sale can not be disputed. But, under the circumstances of this case, should the unpaid purchase money be arrested in equity and be ordered paid to the heirs whose lands were wrongfully sold for the payment of these forged demands against the estate?

We do not perceive McQuigg, even were he appealing, has any rights or equities which have been affected by the decree entered in the circuit court. He was not required by the decree to refund or make good the cash payment on the lands, which he had collected and paid over to Fagan and Whitlock.

It is the position of Whitlock, the appealing claimant, which is principally to be considered. It is his interests and those of Fagan that are affected by the decree. As we have seen, he has wholly failed to show he has any meritorious claim growing out of the note he held. He obtained this forged paper from McClusky and makes no pretence of any value paid by him therefor, and he refuses to discover the circumstances of his possession. Nearly two years after Johnson's death he appears with this forged paper, then nearly two years overdue. Then, instead of presenting the claim to the heirs, or taking out letters as a creditor and proceeding in accordance with the provisions of the statute for its collection, by having some discreet person appointed to defend against it, he secretly places his own attorney in the inconsistent fiduciary position of administrator, and procures the allowance of his claim, without even filing an affidavit of its justice.

This decree affects only the holders of this forged paper, and they do not urge the justice of their demands or equities that grow out of their positions with reference thereto, but claim solely the benefit of an estoppel as against these heirs. The heirs failed to interpose their defence when they should have done so. Were the claimants guilty of any fraud or misconduct that induced or assisted in inducing the heirs to

sleep upon their rights? They wrongfully intermeddled with the estate by imposing their own attorney upon the heirs as administrator, and then kept them in ignorance of the anomalous position that administrator occupied. They deprived them of safeguards provided by law against unjust and fraudulent claims. They not only took from them the services of a discreet person appointed by the court for the special purpose of defending against these claims, by substituting their attorney for themselves in the administration of the estate, but, by that substitution, imposed upon the confidence naturally placed by the heirs in the administrator, so far as regards the allowance of debts against the intestate.

The evidence in the record justifies the conclusion the heirs had no actual knowledge of the allowance of these claims or of the sale of the lands until the day before McClusky absconded. Even then he denied such was the fact. He was the husband of one of the heirs, and, after the death of Johnson, assumed to act as agent for them all. The evidence points him out as the perpetrator or instigator of the forgeries, and he lulled the apprehensions of the heirs in regard to these claims until the very eve of his departure from the State. They seem to have left the matter to him. He was advised by McQuigg, the attorney for the claimants, as to when he was coming out to the farm to make an inventory; and he kept the heirs in ignorance of the status of affairs, although, as is shown by the evidence of McQuigg, he had employed Vandeveer as an attorney to represent himself and the heirs, in some way not disclosed by the record, in the matter. There can be no doubt McClusky knew what was transpiring, and was intentionally misleading appellees. He, and the administrator, and the two claimants, were each engaged in the common object of foisting these fraudulent claims upon the heirs and enforcing their payment out of these lands. All the acts of McQuigg and of the holders of these notes were clearly in concert, and well calculated to mislead appellees and induce the very *laches* it is now sought to take advantage of. McClusky worked to

the same end; but to what extent he acted in concert with Whitlock and Fagan is not discovered by the evidence. From the very necessity of the case the transactions out of which these notes originated must have been matters especially within the knowledge of the claimants, and yet they have failed to make even an attempt to disclose them. They declined the opportunity afforded them on the hearing to show the nature, extent and duration of their connection in these matters with McClusky. They wholly failed to show just and meritorious claims, and made no attempt so to do.

We think the holders of this forged paper should not be allowed, in the court of equity, the benefit of an estoppel growing out of a mere neglect, when, to say the very least, their own acts and conduct and that of their attorney contributed in inducing appellees to neglect making their defence to the notes when they had opportunity so to do in the proceedings to sell land. If the rights of parties with clean hands were here involved, the result might be otherwise. But the decree concerns only the holders of forged notes who refuse to show meritorious possession or to explain their connection with the forger. They and their agent, by wrongful and fraudulent and oppressive practices, contributed to the default. To permit them now the benefit of the estoppel claimed, would give them an advantage from their own wrong, and lead to a result inequitable and unjust. The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*